# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Thomas M. White, Jr.,**
**Petitioner Below, Petitioner**

**FILED**

**February 3, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 18-0892** (Cabell County 16-C-322)

**Donnie Ames, Superintendent,**
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Thomas M. White, Jr., by counsel Steven M. Wright, appeals the September 28, 2018, order of the Circuit Court of Cabell County that denied his petition for post-conviction habeas corpus relief. Respondent Donnie Ames,[1] Superintendent, Mount Olive Correctional Complex, by counsel Caleb E. Ellis, filed a response in support of the habeas court's order.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On November 6, 2012, two armed men entered a known drug house at 1932 Foster Avenue in Huntington, West Virginia. Soon thereafter, at about 10:30 a.m., Cabell County 9-1-1 received a call from a young girl who was in an upstairs bedroom of the drug house with her mother. The girl said she heard gunshots fired inside the house. Around the same time, another child who lived nearby saw two adult males leave the drug house; one was running and the other was limping and carrying a handgun. Both men stopped at a red Honda Pilot that was parked down the street from the drug house. The men argued and then left on foot in different directions.

Huntington police officers arrived at the drug house shortly thereafter. They found Devonte Penn on the main floor of the house; he was bleeding profusely from a gunshot wound to the groin. Mr. Penn told the officers that "Rocky, with a mole on his face" shot him. Mr. Penn died soon thereafter as a result of his gunshot wound. The officers then found Darrell Fuqua on the second floor of the house dead from a gunshot to the leg and the back of the head.

---

[1] Petitioner filed this appeal against Ralph Terry, who was then the Superintendent of the Mount Olive Correctional Center. The Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

1

Around this same time, petitioner asked a friend to take him to the hospital. Petitioner told the friend that he had been shot in a drive-by shooting.

The police searched the crime scene and found drugs and cell phones inside the house, and additional cell phones on the porch of the house and in the mulch next to the porch. Next to the phone in the mulch, the police found a set of car keys that fit a red Honda Pilot (the "Honda") that was seen parked near the drug house. The police searched the Honda and found a Ruger pistol under the front seat. The police also saw a man who had a mole on his face walking near the drug house. The police questioned the man and learned his name was Rocky Williams. The police took Mr. Williams into custody. The police also learned that petitioner was at a local hospital with a gunshot wound.

A forensic investigation found petitioner's blood and latent fingerprint on the Ruger pistol found near the Honda. The police also found petitioner's blood inside the drug house and in the street near the drug house. The police determined that the Honda parked near the drug house was registered in the name of petitioner's girlfriend. The police traced one of the cell phones found on the porch of the drug house to Mr. Williams; they traced the cell phone found in the mulch next to the Honda keys to petitioner. The police searched petitioner's cell phone and discovered text messages between "T-man," who was later determined to be petitioner, and another person known as "Big Dog."

When the police questioned Mr. Williams, he gave varying accounts of what happened at the drug house. For example, he told the police that he was at the drug house to buy drugs and the occupants of the house tried to rob him. However, Mr. Williams eventually confessed that he and petitioner had gone to the drug house to rob the occupants, that the robbery had gone wrong, and that, as he shot Mr. Fuqua in the leg and head on the second floor of the house, he heard shots ring out on the main floor. When the police questioned petitioner, he denied shooting Mr. Penn.

On January 16, 2013, petitioner was indicted on two counts of first-degree murder under West Virginia Code § 61-2-1 for his part in the November 6, 2012, crimes. Mr. Williams was also indicted for multiple crimes, including burglary and second-degree murder. Thereafter, but prior to petitioner's trial in this matter, Mr. Williams pled guilty to one count of second-degree murder and one count of first-degree burglary. The trial court sentenced Mr. Williams to forty years in prison on the murder conviction and ten years in prison on the robbery conviction, to be served consecutively.

Petitioner's trial commenced on April 14, 2014. During its case-in-chief, the State sought to admit photographs of petitioner's two tattoos: "Thug Life" and "Fast Life" as evidence of petitioner's lifestyle. Petitioner's counsel countered that the photographs were prejudicial and irrelevant. The circuit court allowed the evidence over petitioner's objection finding that the prejudicial value of the photographs did not outweigh their probative value.

The State called Mr. Williams to establish his and petitioner's motives for their crimes. Mr. Williams testified that (1) he drove to the drug house in the Honda with petitioner to steal drugs from Mr. Penn; (2) both he and petitioner were armed; (3) he went upstairs where he shot and

killed Mr. Fuqua; (4) he and petitioner ran out of the drug house together towards the Honda; (5) they discovered they lost the keys to the Honda; and (6) ran off in different directions.

A forensic expert in gunshot residue from the West Virginia State Police Laboratory testified that he found gunshot residue on petitioner's hand after the shooting. An expert in tool mark and firearm examinations from the State Police Forensic Laboratory, Philip Cochran, testified that the bullet removed from Mr. Penn's leg was fired from petitioner's Ruger pistol. The State also introduced a call log from Mr. Williams's phone that showed several calls between Mr. Williams and petitioner's phone on November 5, 2012, and November 6, 2012, i.e., the day before and the day of the shooting at the drug house.

Cpl. Paul Hunter of the Huntington Police Department testified regarding the text messages found on petitioner's phone from "T-man" (petitioner) to "Big Dog." Cpl. Hunter stated that the terms used in the text messages are commonly used by those buying or selling illegal drugs.

Petitioner did not testify during his own case-in-chief.

During the instruction phase of trial, the State asked the court to instruct the jury exclusively on a felony-murder theory for both first-degree murder counts. The circuit court gave that instruction as well as a limiting instruction regarding the Rule 404(b) evidence entered at trial, such as the text messages between "T-man" and "Big Dog."

The jury convicted petitioner of two counts of first-degree murder under the felony-murder doctrine. The circuit court sentenced petitioner to two life sentences, with mercy, to run consecutively.

Petitioner filed a direct appeal in which he argued that the circuit court erred in admitting the text messages between "T-Man" and "Big Dog" at trial. We found that the circuit court did not abuse its discretion in admitting the text messages, and noted they "were related to [petitioner's] drug dealing 'business' and tended to show an overall criminal intent to enhance his illegal 'business' by robbing a known drug house." *State v. White*, No. 14-0918, 2015 WL 7628721, at *4 (W. Va. Nov. 20, 2015)(memorandum decision). We also found that the circuit court did not err in finding that the text messages were more probative than prejudicial under Rule 403 of the West Virginia Rules of Evidence. *Id.* Finally, we held that, due to the "ample and overwhelming evidence of petitioner's guilt, any error resulting from the admission of the text messages at trial was harmless." *Id.* at *5.

Thereafter, petitioner filed a pro se petition for a writ of habeas corpus. The circuit court appointed counsel who, on September 30, 2016, filed petitioner's amended habeas petition. The habeas court held an omnibus hearing on August 2, 2018. Petitioner's trial attorneys, Kerry Nessel and Timothy Rosinsky, and petitioner testified at the omnibus hearing. On September 28, 2018, the habeas court issued its order denying relief on all grounds. Petitioner now appeals.

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard;

3

the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

Petitioner raises five assignments of error on appeal. Petitioner first argues that the circuit court erred in denying relief on his claim of ineffective assistance of trial counsel for their failure to retain an expert to conduct an independent analysis of the bullet removed from Mr. Penn's leg. Petitioner's theory of the case appears to have been that Mr. Williams shot Mr. Penn, and that petitioner accidentally shot himself. Specifically, petitioner claims that, when he heard shots fired on the second floor of the drug house, he pulled the Ruger pistol out of the waistband of his pants and accidentally shot himself. Petitioner notes that the bullet remains lodged in his leg and cannot be removed without endangering his life, but that the angle of the bullet wound supports his argument. Petitioner also highlights that Mr. Penn told the police shortly before he died that Mr. Williams shot him. Petitioner claims that, absent an independent investigation of the bullet, it was impossible for him to prove his theory of the case. Accordingly, petitioner contends that no reasonable attorney would have refrained from hiring a forensic expert to show that the bullet that struck Mr. Penn was not fired from petitioner's Ruger pistol.

"In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

Syl. Pt. 2, *Raines v. Ballard*, 236 W. Va. 588, 782 S.E.2d 775 (2016).

At petitioner's omnibus hearing, Mr. Rosinsky, petitioner's primary trial counsel, testified that he investigated petitioner's case extensively, retained an investigator, met with petitioner frequently, and spent more than 300 hours on the case. With respect to the bullet lodged in petitioner's leg, Mr. Rosinsky testified that he asked the State to pay for a surgery to remove the bullet in order to prove that it came from petitioner's gun; however, the surgery could not be performed due to the danger it presented to petitioner's life. Mr. Rosinsky also testified that he chose not to press the issue because he was confident that the State would rely on a felony-murder theory, given that Mr. Penn told the officers that "Rocky [Williams], with a mole on his face" shot him. Mr. Rosinsky further testified that he did not hire a ballistics expert for the same reason, i.e., he saw no benefit in challenging the State's expert's conclusions that the bullet in Mr. Penn's leg came from petitioner's gun because it would not have negated the State's felony-murder theory.

Petitioner's trial counsel's decisions regarding an independent analysis of the bullet found in Mr. Penn's groin, and the presentation of medical evidence showing how petitioner was shot, are ordinarily construed to be strategic or tactical choices. "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no

4

reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. Pt. 5, *Ballard v. Thomas*, 233 W. Va. 488, 759 S.E.2d 231 (2014) (quoting Syl. Pt. 21, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445, 449 (1974)). Here, the record shows that petitioner's trial counsel adequately investigated the issues related to the bullet recovered from Mr. Penn's leg and the bullet lodged in petitioner's groin, and made a strategic decision not to present additional evidence on these issues due to the likelihood that the State would proceed against petitioner on a felony-murder theory, which it did, in fact, do. Accordingly, petitioner fails to satisfy either prong of *Strickland/Miller* with respect to his trial counsel's decision not to retain an expert to conduct an independent analysis of the bullet removed from Mr. Penn's leg.

In petitioner's second assignment of error, he argues that the circuit court erred in denying relief on his claim of ineffective assistance of counsel for his trial counsel's failure to object or move to strike the speculative theories put forth by Detective Chris Sperry at petitioner's trial. At trial, petitioner's counsel called Detective Sperry as an adverse witness. Detective Sperry testified that his theory of the case was a "robbery gone bad." Petitioner's counsel asked Detective Sperry if he had any direct evidence that petitioner and Mr. Williams agreed to rob the drug house, other than Mr. Williams's testimony. Detective Sperry replied,

> [Mr. Williams] sat up here and said I didn't shoot downstairs, I believe. I don't think at the time he knew downstairs, if he shot anybody downstairs or not. I think he fired his gun, he didn't know. I don't think [petitioner] knew for sure who he shot or if he shot anybody until the ballistics report came back, then I knew for sure who he shot.

> So when they went in there to make a drug transaction it went bad, but I know as an investigator . . . , I didn't have to prove who shot who. I just had to show it was a robbery and during the robbery a murder happened, so it doesn't matter who shot who. So I know as an investigator, and the statute is it's murder, everybody is charged with murder.

According to petitioner, Detective Sperry contradicted himself when he said (1) this was a "robbery gone bad," and (2) petitioner and Mr. Williams were at the drug house to make a drug transaction. Petitioner further argues that Detective Sperry speculated as to (1) what Mr. Williams knew at the time, and (2) the applicable law of the case. Petitioner highlights that the trial court told Detective Sperry, "I'm in charge of the law. Just answer the questions." Detective Sperry then testified that,

> something happened in the house to make the shots. I mean, why did he have to shoot everybody in the house, they thought. . . . Why did they have to shoot everybody in the house? When Rocky left, he fired some more grounds [sic]. I think he inadvertently shot [petitioner] on the way out, but they continued to leave together.

At a bench conference immediately thereafter, the court told petitioner's counsel, "This is your witness, he's speculating all over the place on theories that aren't in evidence. So either wrap it up or be direct, but I am not going to let him speculate about the law and things that aren't in

evidence." Petitioner highlights that, despite this admonition, his trial counsel did not object to or move to strike any portion of Detective Sperry's testimony.

Petitioner further argues that Detective Sperry repeatedly told the jury that the police investigated petitioner's girlfriend's Honda with regard to three other crimes, which was why the Detective knew this case regarded a robbery. Petitioner argues that, even if the Honda was involved in other crimes, the evidence regarding those crimes was irrelevant and extremely prejudicial because it suggested petitioner was connected to the other crimes. Petitioner avers that, in light of Rules 401 and 403 of the Rules of Evidence, Detective Sperry's statement about the Honda should not have been admitted into evidence. Petitioner contends that Detective Sperry corroborated the State's theory of the case and that, without Detective Sperry's testimony, the State had only Mr. Williams' testimony that this case regarded a "robbery gone bad." Petitioner contends that his trial counsel should have stopped Detective Sperry from making speculative and prejudicial comments or, alternatively, moved to strike those comments and sought a cautionary instruction from the court. Petitioner concludes that trial counsel's failure to do so satisfies the first prong of *Strickland*. As to the second prong of *Strickland*, petitioner contends there is a reasonable probability that, but for trial counsel's errors, there would have been a different outcome at trial.

We disagree and find that petitioner's trial counsel was not ineffective for allowing Detective Sperry to speculate about the events that transpired at the drug house. Although petitioner cites to various answers given by Detective Sperry, he offers no substantive analysis of the first prong of *Strickland* with respect to those answers. The record on appeal shows that trial counsel made strategic decisions during this line of questioning. For example, trial counsel asked Detective Sperry questions about his investigation of the case to prove the defense's theory of the case, i.e., that the State was proceeding on a felony-murder theory to compensate for their lack of evidence against petitioner. Trial counsel was successful in getting Detective Sperry to admit that the State was doing just that.

As for the habeas court, it found that "trial counsel believed [Detective Sperry's] testimony would be harmless or beneficial to his client." Petitioner has not demonstrated this finding to be clearly erroneous. Indeed, in light of his counsel's overall strategy, opting not to move to strike Detective Sperry's testimony was clearly a strategic decision.

Petitioner also fails to show that he was prejudiced by any of these alleged errors. He asserts that (1) the jury likely deferred to Detective Sperry's testimony; and (2) by allowing Detective Sperry to testify that he believed a robbery occurred the jury heard testimony that supported Mr. Williams's testimony. This claim fails because Detective Sperry's answers were arguably favorable to petitioner's case, *i.e.*, Detective Sperry stated, "I don't think the defendant knew for sure who he shot or if he shot anybody until the ballistics report came back." Detective Sperry also initially characterized petitioner's presence at the drug house as "a drug transaction" before stating that the State "had to show it was a robbery" in order to satisfy the felony-murder statute. That answer restated petitioner's theory of the case that he was at the drug house to buy drugs and the police made the facts fit the State's robbery theory. That said, even if Detective Sperry's testimony was not favorable to petitioner, it was likely not dispositive because the State's case against petitioner was based on significant circumstantial evidence, and – given the overwhelming testimony against petitioner at trial – there is no reasonable probability that the outcome would

have been different if Detective Sperry had not testified or if trial counsel had objected to or moved to strike his testimony.

Petitioner's trial counsel was also not ineffective with regard to Detective Sperry's implication that petitioner was involved in other crimes. Specifically, petitioner points to Detective Sperry's testimony that: (1) "I know [petitioner and Mr. Williams] would have got in a Honda Pilot that I knew who owned that Honda Pilot from a previous incident, I knew who owned that. I know what that car had been involved in." (2) "I had all that information, the information that the [red] Honda Pilot, that I am very familiar with through prior contact in investigating crimes, that [the owner] was [petitioner's] woman." (3) "I know the red Honda Pilot, again I have had interaction with that lady in another particular case, similar to this case, I know its's [petitioner's] woman."

Petitioner claims Detective Sperry's answers suggest petitioner was involved in, or connected to, other similar crimes. Petitioner argues that "no reasonably qualified defense attorney would have failed to object to these prejudicial statements." We disagree. First, each of the answers noted above resulted from an open-ended question; therefore, if trial counsel had objected or moved to strike, the motion likely would have been overruled or denied. *See* Syl. Pt. 4, *State v. Crabtree*, 198 W. Va. 620, 623, 482 S.E.2d 605 (1996). Thus, the decision not to object or move to strike was reasonable to avoid drawing the jury's attention to potentially unfavorable answers. Petitioner also claims that Detective Sperry's answers were prejudicial because they suggested petitioner was involved in other crimes. However, the answers to which petitioner objects focus on the car and on petitioner's "woman," and not on petitioner. Even if the jury inferred otherwise, petitioner fails to show that if trial counsel had objected to Detective Sperry's answers that the outcome at trial would have been different. Accordingly, his ineffective assistance of counsel claim fails as it relates to his trial counsel's handling of Detective Sperry at trial.

In petitioner's third assignment of error, he argues that the habeas court erred in denying relief on his claim that his sentence is disproportionate when compared to Mr. Williams's sentence. Petitioner claims that the nature of his offenses and the circumstances of this case show that his two consecutive life sentences with the possibility of parole are not constitutionally proportional to his level of culpability. Petitioner highlights that Mr. Williams shot and killed Mr. Fuqua, and that, before he died, Mr. Penn said Mr. Williams shot him. Under his plea agreement, Mr. Williams's sentence is ten years in prison for robbery and forty years in prison on the murder charge. Thus, Mr. Williams will be eligible for parole in twelve years and six months. However, under his two life sentences, petitioner will not be eligible for parole for thirty years. Thus, petitioner contends that, in comparison to Mr. Williams's sentence, his sentence shocks the conscience and offends fundamental notions of human dignity, thereby violating West Virginia Constitution, Article III, Section 5 that prohibits a penalty that is not proportionate to the character and degree of an offense. *See* Syl. Pt. 5, *State v. Cooper*, 172 W. Va. 266, 304 S.E.2d 851 (1983). Petitioner claims that his actions did not manifest an intent to kill anyone, nor did he kill anyone, whereas Mr. Williams clearly intended to murder Darrell Fuqua given that he shot Mr. Fuqua in the leg and the head.

In denying relief to petitioner on the ground of constitutional disproportionality of sentence, the habeas court ruled that,

Petitioner was convicted by a jury of two counts of felony murder. The sentence pronounced is proper pursuant to W. Va. Code 62-3-15. The co-Defendant, [Mr.] Williams, entered into a plea deal prior to trial and testified against [p]etitioner at trial. Moreover, trial counsel testified at the omnibus hearing that he had argued for lighter sentencing, but that he and [p]etitioner "knew going in that if we were convicted that that [sentence] was a very real possibility in this case" and that they had many discussions about that in conjunction with the much lower sentences offered to the petitioner in plea negotiations . . . . Therefore, there is not a reasonable argument for relief based on disproportionate sentencing in this case.

There are two tests to determine whether petitioner's sentence is constitutionally impermissible:

The first is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society. If a sentence is so offensive that it cannot pass a societal and judicial sense of justice, the inquiry need not proceed further. When it cannot be said that a sentence shocks the conscience, a disproportionality challenge is guided by the objective test we spelled out in Syllabus Point 5 of *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981):

In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction.

*Cooper*, 172 W.Va. at 272, 304 S.E.2d at 857.

Moreover, "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syl. Pt. 4, *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (1982). Finally, the Court has declined to review proportionality challenges to sentences rendered under statutes providing maximum penalties. A jury convicted petitioner of two counts of first-degree murder, in violation of West Virginia Code § 61-2-1 (1991). In West Virginia, life imprisonment is the required sentence for a defendant convicted of such a crime. *See* W. Va. Code § 61-2-2; *see also State v. Holstein*, 235 W. Va. 56, 68, 770 S.E.2d 556, 568 (2015) (finding that a sentence of life imprisonment for first-degree murder was "unquestionably within statutory limits"). As for parole, a defendant convicted of first-degree murder by a jury and sentenced to life imprisonment is not eligible for parole, absent the jury's recommendation of mercy. If mercy is granted, the defendant becomes eligible for parole after serving fifteen years in the penitentiary. *See* W. Va. Code § 62-3-15. Here, the State declined to seek the jury's determination regarding mercy. Nevertheless, the circuit court sentenced petitioner

as if there had been a mercy recommendation. Therefore, the court sentenced petitioner in accordance with the relevant statutes, and he has not shown that his sentence was based on any impermissible factor. Therefore, his sentence is not subject to appellate review.

Petitioner's sentence is also not subjectively or objectively disproportionate. As noted above, under the subjective test for disproportionality, "[p]unishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *Cooper*, 172 W. Va. at 267-68, 304 S.E.2d at 852, syl. pt. 5. "'If a sentence is so offensive that it is found to shock the conscience, the inquiry need not further proceed. Such a sentence must be vacated.' *See Cooper*, 172 W.Va. at 272, 304 S.E.2d at 857." *State v. Goff*, 203 W. Va. 516, 523, 509 S.E.2d 557, 564 (1998). If a sentence does not shock the conscience, the Court evaluates it under the objective test set out above in syllabus point 5 of *Wanstreet,* 166 W. Va. at 523-24, 276 S.E.2d at 207. Petitioner's sentence does not shock the conscience. Murder is, by its very nature, a heinous offense because it involves the taking of a human life. Here, the evidence showed that two men died due to petitioner's and Mr. Williams's acts. The evidence also showed that the crime occurred in a home where a child and her mother were present. Therefore, under the subjective standard, petitioner's life sentence, with mercy, for each of his first-degree murder convictions is not disproportionate.

Nor was petitioner's sentence disproportionate when considered under *Wanstreet's* objective factors. First, we examine the nature of the offense. As previously stated, murder is a heinous offense. In this case, the two murders occurred while petitioner and Mr. Williams sought to rob the victims of illegal drugs. Second, under West Virginia Code § 61-2-2, life imprisonment is the mandatory sentence for a first-degree murder conviction. Third, a review of other jurisdictions shows that a life sentence with the possibility of parole is not an unduly harsh sentence for a first-degree murder conviction. For example, in Pennsylvania and Missouri, a conviction of first-degree murder carries the potential sentence of death or life without possibility of parole. *See* Mo. Rev. Stat. § 565.020; 42 Pa.C.S.A § 9711. In Tennessee, the penalty ranges from death to life with or without the possibility of parole. *See* Tenn. Code § 39-13-204(a). Fourth, in comparison with other offenses in West Virginia, many other serious crimes are also punishable by a life sentence or an uncapped determinative sentence. *See*, *e.g.*, W. Va. Code § 61-1-2 (treason punishable by up to life imprisonment); W. Va. Code § 61-2-14a (kidnapping punishable by life with or without the possibility of parole); W. Va. Code § 61-2-12 (first-degree robbery punishable by an uncapped determinative sentence with a minimum of ten years). Thus, petitioner's sentence was clearly not disproportionate.

Petitioner also asserts that his sentence is disproportionate in light of Mr. Williams's consecutive sentences of forty years in prison for second-degree murder, and ten years in prison for first-degree robbery. "Disparate sentences for codefendants are not per se unconstitutional" but if "codefendants are similarly situated, some courts will reverse on disparity of sentence alone." Syl. Pt. 2, *State v. Buck*, 173 W. Va. 243, 314 S.E.2d 406, 407 (1984). In determining whether codefendants are similarly situated, the Court considers "each codefendant's respective involvement in the criminal transaction (including who was the prime mover), prior records, rehabilitative potential (including post-arrest conduct, age and maturity), and lack of remorse." *Id.* In this case, such an inquiry has no application because petitioner and Mr. Williams were convicted

9

of different crimes and in different manners, *i.e.*, Mr. Williams plead guilty to second-degree murder and first-degree robbery, while a jury convicted petitioner of two counts of first-degree murder under a felony-murder theory. Petitioner asserts this distinction is not dispositive given that the co-defendants in *Buck* were also convicted of different offenses. However, unlike petitioner, Mr. Buck was convicted of first-degree robbery; accordingly, the trial court had discretion in sentencing. Finally, petitioner received the minimum possible sentence for each of his convictions: life with the possibility of parole.

In petitioner's fourth assignment of error, he argues that the habeas court erred in denying relief on his claim of ineffective assistance of appellate counsel for appellate counsel's alleged failure to fully argue issues regarding Rule 404(b) evidence. Petitioner's appellate counsel listed twelve assignments of error in petitioner's notice of appeal. Petitioner avers that he urged appellate counsel to raise additional grounds in his direct appeal and to meet with him to discuss those grounds prior to the filing of his appeal. However, appellate counsel opted not to meet with petitioner or to allow him to review his petition on appeal, which regarded only the admission at trial of the text messages between "T-man" and "Big Dog."

At the omnibus hearing, petitioner's habeas counsel questioned petitioner's appellate counsel as follows:

> *Habeas Counsel*: Do you recall whether or not you met with [petitioner] prior to filing your Supreme Court appeal?
>
> *Appellate Counsel*: I don't think so. I've never been to prison to see him. I was over at the Western Regional a lot to see him.
>
> *Habeas Counsel*: Do you recall whether or not he sent you correspondence with the substance of said correspondence directing you to meet with him prior to the filing?
>
> *Appellate Counsel*: I don't know. He may have. I wouldn't have cared, to be honest with you. It's a legal document and I know [petitioner] didn't go to law school, I know I did. And I don't routinely meet . . . with my clients on criminal appeals once the record has been made, and it was in this case made.
>
> In the order on appeal, the habeas court found that,
>
> All of the issues addressed [in petitioner's direct] appeal related to the introduction of Rule 404(b) evidence [the text messages sent between "T-man" and "Big Dog."] The Court fully considered those issues and addressed each in the resulting Memorandum Decision. The other extraneous issues that the [p]etitioner claims should have also been raised on appeal do not rise to the level of ineffective assistance. Importantly, the Supreme Court's Memorandum decision specifically notes that there was "ample and overwhelming evidence of petitioner's guilt . . . ."

Regarding petitioner's claim that appellate counsel refused to meet with him to discuss the issues to be raised in petitioner's appeal, the United States Supreme Court has held that

appellate attorneys must have discretion in selecting the issues on appeal. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983) ("Nothing in the Constitution or our interpretation of that document requires" appellate counsel to "raise every 'colorable' claim suggested by a client. . . ."). Therefore, it was reasonable for appellate counsel to focus on the admission of the text messages between petitioner ("T-man") and "Big Dog." Accordingly, petitioner fails to show appellate counsel's performance was deficient.

Petitioner also claims that his appellate counsel was deficient for failing to appeal the introduction of the photographs of petitioner's tattoos as improper 404(b) evidence, to his prejudice. Petitioner's claim fails under *Strickland's* prejudice prong because he fails to state how the result of his appeal would have been different if appellate counsel had raised that issue. In petitioner's direct appeal the Court found with regard to the admission of certain text messages on petitioner's phone that, even it were assumed that the circuit court erred in allowing this evidence, it was harmless given the "ample and overwhelming evidence of petitioner's guilt." *White*, 2015 WL 7628721, at *5. Given that the evidence of petitioner's guilt was so substantial, even if appellate counsel had raised the admission of the photographs of petitioner's tattoos, there was no reasonable probability that the Court would have reversed his conviction. Accordingly, petitioner's ineffective assistance of appellate counsel claim fails because he failed to demonstrate that he was unfairly prejudiced by the admission of this evidence.

In petitioner's fifth assignment of error, he argues that the habeas court erred in denying relief for the cumulative effect of the State's multiple errors at trial. The cumulative error doctrine does not apply where no errors are found. *See State v. Knuckles*, 196 W. Va. 416, 473 S.E.2d 131(1996). "Cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Id.* at 426, 473 S.E.2d at 141. Having found no error, we reject this assignment of error.

For the foregoing reasons, we affirm the habeas court's September 28, 2018, order denying petitioner's request for post-conviction habeas corpus relief.

Affirmed.

**ISSUED:** February 3, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison